FILED

04 FEB 20 PM 3: 56

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ARTHUR R. CLARK, JR.,

    Plaintiff,

vs.

CORRECTIONAL MEDICAL SERVICES,
INC., a Missouri corporation; BENJAMIN
MOSQUERA, M.D. and JOHN MUBANG,
M.D., physician employees or contractors of
Correctional Medical Services, Inc.; THOMAS
HALL and WILLIAM FITCH, officers with
Hillsborough County Sheriff's Office.

    Defendants.

_____/

**CASE NO. 8:03-cv-656-T-23EAJ**

**THIRD AMENDED
COMPLAINT AND DEMAND
FOR JURY TRIAL**

## THIRD AMENDED COMPLAINT

Plaintiff sues defendants and alleges:

### PRELIMINARY STATEMENT

1. This is an action under 42 U.S.C. § 1983 ("§ 1983") arising from claimed

denials of timely and proper medical care for plaintiff's broken arm during his

incarceration in the Hillsborough County jail system in August, 2001.

### JURISDICTION

2  Original federal question jurisdiction properly lies in this Court under 28

U.S.C. §§ 1331 and 1343.

### PARTIES

3. Plaintiff Arthur R. Clark, Jr. ("Clark." or "Plaintiff") resided in the City of

Tampa where on August 11, 2001, he was arrested by officers of the Tampa Police

5 7

Department ("TPD") and booked into the jail system operated by the Hillsborough County Sheriff's Office ("HCSO").

4. Defendant Correctional Medical Services, Inc. ("CMS") is a Missouri corporation that in 2001 was providing medical care and treatment to inmates and detainees within the Hillsborough County jails under contract with the HCSO and which was responsible, at least in part, for the timing and nature of the medical treatment Clark received for his broken arm.

5. Defendants Benjamin Mosquera, M.D. ("Mosquera") and John Mubang, M.D. ("Mubang") were physicians employed by or under contract with CMS who were personally involved in and responsible, at least in part, for the timing and nature of the medical treatment Clark received for his broken arm.

6. Defendants Thomas Hall ("Hall") and William Fitch ("Fitch") were deputy officers with the HCSO who were, respectively, the Facility Commander and Shift Commander at the Falkenburg Road Jail and who were personally involved in and responsible, at least in part, for the timing and nature of the medical treatment Clark received for his broken arm by their actions on Clark's inmate grievance(s).

STATEMENT OF CLAIM

(ALLEGATIONS COMMON TO MEDICAL CARE COUNTS)

7. During the course of effecting Clark's arrest on misdemeanor bad check charges on August 11, 2001, an officer with the TPD struck Clark's left forearm with his metal night stick one or more times causing a complete fracture of Clark's left ulna.

8. A detainee or inmate with a complete fracture of the ulna (forearm bone

-2-

opposite the thumb) has a serious medical need for which he requires urgent and commonly-understood medical attention and care that includes examination by a doctor of the fractured area and x-rays of the fracture, setting of the bone (proper alignment) by a doctor if necessary, and immobilizing of the fracture in a cast or other similar device.

9.  As is also commonly understood, delay in receipt of necessary treatment for a fractured ulna as with many other fractures can prolong and heighten the pain suffered by the patient and increase the risks of serious medical complications: compounding of the fracture which increases risks of infection;  and,  fusing of the fractured parts of the bone while in improper alignment which could result in the bone having to be rebroken and reset, deformities, or weaknesses.

10.  During the booking process at the Orient Road Jail, both to HCSO detention staff and CMS medical staff Clark reported and complained about his broken arm and pain and requested medical attention.

11.  Clark was first seen by non-physician medical personnel at the Orient Road Jail on August 11, 2001. They documented Clark's complaints and visible injuries including those to his left forearm and wrapped his broken arm in an ace bandage and gave him ice and Motrin. They also on that date prepared an x-ray request form regarding: "Fx (L) arm/wrist."

12.  Despite ongoing verbal complaints of a broken arm and pain made by Clark to jail detention staff, it was not until Monday, August 13, 2001, that his left arm was x-rayed at the Orient Road Jail facility.  The x-rays were obvious (and seen by Clark): the bone was fractured in two widely displaced parts.

-3-

13. On the CMS x-ray request form, on August 13, 2001, defendant Mosquera made the following findings (regarding Clark's left forearm and wrist):

> "There is a transverse fracture at the distal part of the left ulna with displacement. The rest of the visualized osseous structures are intact."

14. Aware of Clark's broken arm and x-rays, CMS, Mosquera and Mubang referred Clark to an off-site orthopedic specialist for necessary treatment of his broken arm. "For ortho consult [and for] wrist support" is noted in the CMS Physicians' Orders on 8.13.01 for Clark.

15. HCSO had to approve and arrange scheduling or provide transportation and custody in order for Clark and other wards to receive off-site medical treatment.

16 On or about August 15, 2001, Clark was transferred from the Orient Road to Falkenburg Road Jail. A medical intrasystem transfer summary was filled out and signed by nurses at both facilities and Clark. The receiving facility portion of the form noted the fractured left arm and x-rays of 8.13.01 and that a referral was needed.

17. Between August 13 and 23, Clark made repeated verbal and written requests of CMS medical staff and HCSO detention staff urgently seeking needed medical treatment for his broken arm and complaining of extreme pain.

18. During this August 13-23 period, CMS, defendant doctors Mubang and Mosquera, or HCSO failed to provide Clark with needed medical treatment for his fracture either within the jail or off-site. Instead, Clark received only grossly inadequate treatment for his fracture: an ace bandage wrap, Motrin, and initially ice, no splint, and no assignment to a bottom bunk or excuse from mopping duties until August 20.

-4-

19.  At least one or two of Clark's written requests urgently seeking necessary medical treatment for his broken arm were formal inmate grievances submitted at the Falkenburg Road Jail to HCSO detention staff.

20.  On August 17, 2001, Clark submitted an inmate grievance requesting urgent treatment for his fractured arm, a true copy of which is affixed as "Attachment A." The inmate grievance portion of the form recited in Clark's own hand:

> "I have been locked up since 8-10-01. My arm was x-rayed 8-11-01. Result of x-ray, my arm brok[e] so bad I was told by med. They have to send me to ortho. specialist. It's been over a week. I am in constint pane! I have not gotten propper med. treatment. Please help?"

Under the suggested solution portion of the grievance, Clark further wrote and noted:

> "Get me to the doctor now iff not sooner." Clark then drew a sketch of a normal bone and his own bone which showed a complete, displaced fracture.

21.  In response to Clark's grievance, the Shift Supervisor and Commander noted and took this action on August 17:

> "Per medical records, you are scheduled to see an outside orthopedic consultant. You cannot be given the date as it is a security risk."

Defendant Fitch was the Shift Commander who signed the grievance.

22.  On August 20, the Facility Commander, Hall, signed Clark's grievance concurring with and approving the Shift Supervisor and Shift Commander's actions.

23.  In a sick call slip submitted at the Falkenburg Road Jail and dated August 20, 2001, Clark complained:

> "I have a badly broken arm.  It's been over ten days.  I have not even seen a doctor. Please Help Me!  I am in serious pain & also need pain meds. Please, please HELP ME!!!"

24. In a sick call slip submitted 3 days later on August 23, 2001, Clark wrote:

"When the famlye dog breaks his arm he is taken to the vet right away. I have been locked up two weeks with my arm broke in two. I am a human being. Why am I being denied med. treatment? Why am I being treated less then a dog?"

25. Clark was never personally seen, examined, or interviewed by Hall or Fitch or Mubang or Mosquera in connection with his fractured arm or in response to his multiple sick call slips or inmate grievances concerning that fracture.

26. On August 24, 2001, Clark was finally taken to a clinic operated by Tampa General Hospital for examination by an orthopedic specialist. She was aghast over the delay and, after x-rays, immediately placed his broken arm in a long, above-elbow plaster cast without attempting to set or re-break the fracture that had already started to fuse.

27. As a result of being denied proper and needed medical care and treatment in timely fashion, Clark suffered additional and prolonged pain and discomfort and risks of further serious medical complications including one that materialized with the bone fusing prior to physician examination and setting and casting of the fracture leaving Clark to experience frequent pain and discomfort and bone weakness long after the permanent cast had been removed. Future medical treatment will likely be required.

28. As a detainee or sentenced prisoner in the Hillsborough County jails, Clark had the rights under the due process clause of the 14th Amendment or 8th Amendment, U.S. Constitution, enforceable through § 1983, not to have defendants intentionally disregard, or act with deliberate indifference to his needs for medical care for his severely-broken arm.

29. The complained of actions or inactions of the individual defendants

-6-

constituted behavior and conduct falling within the scope of their employment or agency.

30.  The complained of actions or inactions of defendants constituted state action or matters under color of law within the scope and meaning of § 1983 and the 14th Amendment, U.S. Constitution.

COUNT I
§ 1983 CLAIM FOR COMPENSATORY AND PUNITIVE DAMAGES<br>AGAINST HALL AND FITCH FOR DENYING CLARK MEDICAL CARE

31.  Clark realleges ¶¶ 2-30.

32.  Defendants Fitch and Hall had or should have received training and instruction regarding duties of jail detention staff to recognize and respond to serious medical needs of inmates or detainees.

33.  From experience, training, or otherwise, Fitch and Hall knew that needed and customary treatment for Clark's fracture included examination by a doctor and setting and casting of the fracture and that denying or delaying such treatment could prolong or increase the patient's pain and suffering and increase his risks of further serious medical complications.

34.  As a result of their review or action on Clark's inmate grievance (Attachment A), Hall and Fitch knew that:

a.  Clark had been booked into the jail system on August 11 with a serious medical problem: a fracture of his arm;

b.  Clark was complaining of being in constant pain and of not receiving proper and necessary medical treatment for his fracture in nearly a week or longer;

c.  Clark reported that his arm was broken so badly that medical staff could not

-7-

provide necessary treatment on-site and had referred him to see an orthopedic specialist for proper and necessary medical treatment;

    d.  Clark had not yet seen an orthopedic specialist for proper and necessary treatment;

    e.  For reasons of security, the orthopedic examination that had been requested for Clark either could not be accommodated or it had been scheduled [for August 24] but the date could not be disclosed to Clark;

    f.  Clark either would not likely receive necessary medical treatment at all or that it would likely be further delayed until the scheduled appointment with the orthopedic specialist.

    35.  Defendants Fitch and Hall possessed the authority to expedite needed medical treatment for Clark's fractured arm including, among other possibilities, directing that Clark be transported without further delay either to Tampa General Hospital for emergency medical treatment or to an orthopedic specialist as CMS physicians or medical staff had previously directed.

    36.  Despite having the authority, means, and opportunity for expediting treatment for Clark's fractured arm, both rejected Clark's inmate grievance demand for effective and needed treatment without further delays causing Clark to suffer increased pain and serious risks of medical complications some of which materialized and needless physical and emotional injuries.

    37.  Hall and Fitch intentionally, wantonly, recklessly or with deliberate indifference to the needs and pleas by Clark for medical treatment for his broken arm

while incarcerated denied Clark medical care for his serious condition in violation of the

due process clause of the 14th and 8th Amendments, U.S. Constitution.

COUNT II
§ 1983 CLAIMS FOR COMPENSATORY AND PUNITIVE DAMAGES
AGAINST MOSQUERA AND MUBANG
FOR DENYING CLARK NEEDED MEDICAL CARE

38. Clark realleges ¶¶ 2-30.

39. From experience, education, and training, doctors Mubang and Mosquera

knew that customary, proper, and necessary treatment for a fracture generally consisted of

examination by a doctor and setting and casting of the fracture and that denying or

delaying such treatment could prolong or increase the patient's pain and suffering and

increase his risks of further serious medical complications.

40. Doctors Mosquera and Mubang knew Clark's broken arm required urgent

medical treatment and had the means and authority for promptly securing same for Clark.

41. Doctors Mosquera and Mubang could have expedited any scheduled

appointment with an orthopedic specialist for Clark's arm, sent him to another specialist

if the initial specialist was not promptly available, or sent him to Tampa General Hospital

or other facility for outpatient emergency treatment and care.

42. Doctors Mosquera and Mubang responded to the serious medical needs of

Clark with deliberate indifference in violation of Clark's rights under the 14th and 8th

Amendments.

43. For over ten (10) days Mosquera and Mubang provided Clark with grossly

inadequate medical care for a fractured arm (not even providing a temporary splint and,

-9-

for a good portion of the time, medical authorization for a lower bunk or the avoidance of physical tasks such as mopping ).  Their actions or inactions caused Clark to wait for over ten (10) days before receiving urgently needed medical treatment for his broken arm, to suffer increased pain, serious risks of medical complications some of which materialized, and needless physical and emotional injuries.

COUNT III
§ 1983 CLAIM FOR DAMAGES AND OTHER APPROPRIATE RELIEF<br>AGAINST CMS FOR DENYING CLARK NEEDED MEDICAL CARE

44.  Clark realleges ¶¶ 2-30.

45.  The actions of CMS in responding to Clark's needs for medical care and treatment for his broken arm in August, 2001, were products of its official policies and procedures or practices adopted or developed for responding to the serious medical needs of inmates or detainees in the Hillsborough County jail system.

46. In August, 2001, the official policies, procedures, or practices of CMS and the HCSO for the delivery of medical care to inmates and detainees in the Hillsborough County jail system were, at least in part, embodied in, or generated by the contract between CMS and the HCSO.  True copy affixed as Attachment B ("contract").

47. Under the contract, HCSO engaged CMS to provide for "reasonable and necessary" medical care of inmates and detainees. Attach. B. ¶ 1.1. While CMS was broadly obligated under the contract to provide screening and on-site services as well as off-site specialty, emergency and hospital services, Attach. B. ¶¶ 1.2 to 1.5, those obligations were subject to other contract provisions and practices, financial incentives, and disagreements that often delayed, denied or directed off-site care as they did with

-10-

Clark's needed off-site treatment for his broken arm:

a. CMS was paid no more for effecting the delivery of urgently needed off-site medical care on an emergency basis (for which CMS was also obligated to provide transportation) than through less expensive, routine scheduling at outpatient specialty clinics for which HCSO provided transportation (Attach. B. ¶¶ 1.4, 1.8, Art. IX);.

b. HCSO had to approve, coordinate, and provide transportation and custody for non-emergency, off-site medical care (Attach. B. ¶¶ 1.4, 1.8, 6.1, 6.2);

c. Various contract provisions created uncertainties or causes for disagreement between CMS and the HCSO over responsibilities for effecting or financing the delivery of needed care:

i. CMS is not liable or responsible for the payment of any claim or liability arising out of HCSO preventing any inmate from receiving medical care ordered by CMS or its failure to exercise good judgment in promptly presenting any ill or injured inmate for treatment by CMS (Attach. B. ¶¶ 1.9(c), 10.5(a)(ii);

ii. In the event that any recommendation by CMS for particular health services for any inmate or transfers to a medical facility should not be implemented and carried out for security reasons, CMS is released from professional liability for any damages resulting from any such decision on the part of HCSO (Attach. B. ¶ 6.1); and,

iii. While CMS is obligated to defend and hold HCSO harmless from any claims based on CMS's performance of its obligations under the contract, such CMS obligations shall not apply: where liability exists in whole or in part on the HCSO; where the claim arises from treatment of an inmate's injury that occurred prior to incarceration

-11-

or from HCSO preventing any inmate from receiving medical care ordered by CMS or its failure to exercise good judgment in promptly presenting any ill or injured inmate for treatment by CMS (Attach. B. ¶¶ 10.5(a)(i), (ii).

48. CMS had delegated to its defendant doctors or on-site administrator or manager whose identity is currently unknown final authority for arranging off-site medical care and treatment  for inmates and detainees within the Hillsborough County jail system.  Defendant doctors or CMS's on-site administrator or manager personally arranged or approved the off-site medical care and treatment for Clark's broken arm in August, 2001.  As such, the timing and delivery of offsite medical care and treatment for Clark's broken arm was, at least in part, the product of CMS policy as established by its final policymaker.

49. As a direct or foreseeable result of CMS's sanctioned and constitutionally-deficient medical care policies, procedures, or practices for addressing serious conditions of its inmates or detainees, Clark was denied needed medical care and suffered prolonged, enhanced, and aggravated physical, mental, and emotional injuries.

(PRAYER FOR RELIEF)

Wherefore, Clark respectfully requests:

A.  trial by jury on all issues so triable as a matter of right; and,

B.  entry of judgment by this Court awarding Clark:

1.  Compensatory damages against and among all defendants in such amounts as the jury may determine and apportion;

2.  Punitive damages against the individual defendants in such amounts as

-12-

the jury may determine and apportion;

      3. Such other relief against any, some, or all defendants as equity and

justice warrant; and,

      4. Taxable costs of this litigation including reasonable attorneys' fees

pursuant to 42 U.S.C. § 1988.


Jeffrey H. Klink (FBN: 151657)      J. Michael Shea (FBN: 120989)
Jeffrey H. Klink, P.A.      Shea & Associates, P.A.
P. O. Box 1165 (419 W. Platt St.)      419 West Platt Street
Tampa, FL 33601-1165      Tampa, FL 33606-2243
TEL: 813.258.0288      TEL: 813.251.0733
FAX: 813.258.0346      TEL: 813.831.8990

Trial Counsel for Plaintiff, Arthur R. Clark, Jr.

By: _____
          Jeffrey H. Klink


### Certificate of Service

    I CERTIFY that a true copy of the Third Amended Complaint with enclosures was provided by U.S. mail this 20th day of February, 2004, to: Ellen Leonard, Esquire, P. O. Box 3371, Tampa, FL 33601-3371 (counsel for Hall and Fitch) and, Ron Chapman, Esquire, Chapman & Associates, Suite 350, 40950 Woodward Avenue, Bloomfield Hills, MI 38404 (Counsel for CMS, Mubang, and Mosquera).

_____
          J. H. Klink

## HILLSBOROUGH COUNTY SHERIFF'S OFFICE
### Detention Department
## INMATE GRIEVANCE

No: _____

TO: Shift Commander

FROM: CLARK ARTHUR R.        01043573        2-B
   Last Name, First MI          Booking Number      Cell

FACILITY: ( ) Orient Road Jail   ( ) Morgan Street Jail   (✓) Falkenburg Road Jail   ( ) Work Release Center

State the nature of the complaint including the date, time and location where the incident occurred, and date that the grievance is being filed. Sign form, return to deputy and request a copy.

I HAVE BEEN LOCKED UP SINCE 8-10-01.
MY ARM WAS BRAKE AS A Result of X-RAY MY ARM IS
RoM in BAD I WAS TOLD BY MED, THAT I HAVE TO SEND ME TO ORTHO
SPECLIST IT'S BEEN OVER A WEEK. I AM IN ANSTENT PAIN
BEEN LIKE THIS OR BE DENIED TREATMENT. PLEASE HELP
(Do Not Write On The Back Of This Form. Attach Additional Sheets If Needed)

SUGGESTED SOLUTION (Inmate): GET ME TO THE DOCTOR NOW

_____

ADMINISTRATIVE RESPONSE/ACTION TAKEN: Per medical records, we are scheduled to see an office orthopedic consultant. You cannot be given the date as its a security risk.

Receiving Shift Supervisor ___ 8-17-01 ___ Shift Commander/PID # ___ 17-01

I acknowledge receipt of the findings and/or action taken regarding my grievance, and understand that I have the right to appeal within 15 days to the Commander in writing. A copy of this completed form will be placed in my inmate file.

I would / would not like to request an appeal. (Appeals must be submitted within 15 days and must include a copy of this grievance.)

Signature of Inmate ___ 08-17-01 ___ Date

CONCUR/DISAGREE _____

Reviewed by: _____ ___ 8-20-01 ___ Date

Distribution: White — Inmate File   Canary — Detention Corporal   Pink — Assistant Facility Commander's signature   Goldenrod — Inmate
HCDD 5040   Rev. 3/00

**THIS AGREEMENT** by and between Cal Henderson, as Sheriff of Hillsborough County, a county constitutional officer of the State of Florida (hereinafter referred to as the "SHERIFF") and Correctional Medical Services, Inc., a Missouri Corporation, (hereinafter referred to as "CMS"), is entered into on the 1st Day of October, 2000.

## WITNESSETH

**WHEREAS,** the SHERIFF is charged by law with responsibility for administering, managing, and supervising the health care delivery system of the Hillsborough County Correctional Facilities, and

**WHEREAS,** the said county correctional facilities consisting of four (4) facilities, to-wit: The Morgan Street Jail, the Orient Road Jail, the Falkenburg Road Jail, and the Orient Road Work Release Facility, (hereinafter referred to as ("Facilities"), and

**WHEREAS,** the objective of the SHERIFF is to provide for the delivery of quality health care to inmates in accordance with applicable law; and

**WHEREAS,** the SHERIFF desires to enter into a health care services agreement with CMS to promote this objective; and

**WHEREAS,** CMS is in the business of providing correctional health care services and desires to provide such services for the SHERIFF under the terms and conditions hereof;

**NOW THEREFORE,** with the intent to be legally bound, and in consideration of the covenants and promises hereinafter made, the parties hereto agree as follows:

## ARTICLE 1: HEALTH CARE SERVICES

1.1 General Engagement. The SHERIFF hereby engages CMS to provide for the delivery of reasonable and necessary medical, psychiatric, and dental care to individuals under the custody, and control of the SHERIFF and incarcerated at the Facilities ("Inmates"), and CMS hereby accepts such engagements according to the terms and provisions hereof.

1.2 Scope of Services. CMS will provide total professional medical, psychiatric, dental and related health care and medical administrative services for the Inmates. Including a program for preliminary screening and intake evaluation of Inmates upon arrival at the Facilities, a comprehensive health assessment in accordance with Florida Model Jail Standards and the National Commission for Correctional Healthcare Standards Jails, regularly scheduled sick call, infirmary care, hospitalization, medical speciality services, chronic clinics, emergency services, medical records management, pharmacy and pharmaceutical services, education and training services, utilization review, quality assurance program, administrative support services and other services that may be more specifically described in this agreement. Nursing coverage will be provided on site as per the staffing pattern agreed upon 24 hours a day, 7 days a week. All health care services performed and provided pursuant to this agreement will be by personnel who are fully qualified and appropriately licensed by the state of Florida to engage in the delivery of health care in the state of

Florida.

1.3 <u>Speciality Services</u>. CMS will provide speciality services (e.g. radiology services, EKG services, laboratory services, physical therapy, etc.) on site to the extent reasonably possible. To the extent speciality care is required and cannot be rendered on site. CMS will make appropriate off site arrangements for the rendering of such care.

1.4 <u>Emergency Services</u>. CMS will provide emergency medical treatment to Inmates, visitors and Facility staff as necessary and appropriate on site. CMS will provide off site emergency medical transportation and care as required for Inmates through arrangements and contracts with local hospitals. CMS will provide ambulance services for emergency circumstances. Routine transfers, and non-emergency medical appointments will be arranged through the Sheriff's Transportation Bureau.

1.5 <u>Hospitalization Services</u>. CMS will arrange for the admission of any inmate/detainee who, in the opinion of the CMS Medical Director, requires hospitalization and CMS will be fully responsible for any and all costs or expenses incurred thereof.

(1) CMS's annual liability for costs associated with hospitalization, in accordance with this subsection, will be limited in the following circumstances to the hereinafter stated amounts, unless otherwise provided in this Agreement.

(a) Twenty Thousand Dollars ($20,000) per inmate/detainee paid by CMS to health care provider(s) for any single illness or injury requiring hospitalization medical services, as required by the terms of this Agreement.

(b) Forty Thousand Dollars ($40,000) in the aggregate for illness or injuries affecting more than one inmate/detainee paid by CMS to any health care provider(s) that may arise out of the same occurrence or incident by requiring hospitalization medical services, as required by the terms of this Agreement.

1.6 <u>Infant Care</u>. CMS will provide health services to any pregnant Inmate but health care services provided to an infant following birth will be the responsibility of Hillsborough County.

1.7 <u>Elective Medical Care</u>. CMS will not be responsible for the provision of elective medical care to Inmates. For purposes of this Agreement, "elective medical care" means medical, dental, and mental health care which, if not provided, would not in the opinion of CMS' Medical Director cause the Inmate's health to deteriorate or cause definite harm to the Inmate's well-being.

1.8 <u>Transportation Services</u>. To the extent any inmate requires off-site health care treatment (general hospitalization, speciality services, etc.) SHERIFF will provide appropriate routine transportation services including reasonable security, as requested by CMS. Emergency ambulance transportation of inmates, as directed by CMS personnel, will be provided by CMS through arrangements with community providers.

1.9 <u>Unauthorized Absence</u>. To the extent possible and medically appropriate, CMS agrees to render on-site medical services to Inmates for injuries incurred prior to incarceration, or while the Inmate was away from the jail in the custody of the SHERIFF's office. In no event, however, shall CMS be liable for or responsible for the payment of:

    (a)    any claim, liability, cost or expense arising or incurred at any time in connection with treatment of any Inmate's injury if such injury occurred during any period of an inmate's excused absence because of a work release furlough, or

    (b)    any claim, liability, cost or expense arising or incurred while the Inmate was away from the Facility during an unauthorized absence but prior to the Inmate being taken into custody and control of the SHERIFF or his officers.

    (c)    any claim, liability or cost arising out of the County, the Sheriff's or any of their respective employee's, officer's, agent's or subcontractor's (i) preventing any Inmate from receiving medical care ordered by CMS employees or contractors, (ii) failure to exercise good judgment in promptly presenting any ill or injured Inmate for treatment by CMS employees or contractors.

## ARTICLE II: PERSONNEL

2.1 <u>Staffing</u>. CMS will provide medical, mental health, dental, technical and support personnel necessary for the rendering of health care services to Inmates as contemplated herein. The health care staff will be at levels consistent with Attachment A - Final Staffing Chart.

2.2 <u>Licensure, Certification and Registration of Personnel</u>. All personnel provided or made available by CMS to render services hereunder will be licensed, certified or registered, as appropriate, in their respective areas of expertise pursuant to applicable Florida law.

2.3 <u>Sheriff Approval of CMS Health Care Personnel</u>. In the event the SHERIFF should become dissatisfied with any health care personnel provided by CMS hereunder, CMS, in recognition of the sensitive nature of correctional services, will, following receipt of written notice from SHERIFF of its dissatisfaction and the reasons thereof, exercise its best efforts to resolve the concerns expressed by the SHERIFF in its written notice, and if such concerns cannot be resolved, CMS shall remove the individual from the correctional system. SHERIFF agrees to allow CMS reasonable opportunity prior to removal to find an acceptable replacement. SHERIFF shall have the right of reasonable disapproval of any health care professional hired or contracted by CMS. CMS agrees that any such person hired or contracted shall be subject to a Sheriff's Office background investigation.

2.4 <u>Use of Inmates in Health-Care Facility</u>. Inmates' detainees (trusty) will not be used or otherwise engaged by either CMS or SHERIFF in the direct or indirect rendering of any health care services pursuant to this Agreement. Trusties may be used in positions not involving the rendering of health care services directly or indirectly to other inmates/detainees within a health care facility as CMS and the SHERIFF may mutually agree.

2.5 <u>Subcontracting and Delegation</u>. SHERIFF acknowledges that CMS will engage and

contract with certain health care professionals as independent contractors rather than employees of CMS, and SHERIFF expressly consents to subcontracting of health care professionals. The CMS Medical Director shall, at all times, be responsible for the overall management and direction of the aforementioned health care professionals notwithstanding their independent contractor relationship with CMS. The services provided hereunder will be designed to meet the standards developed by the National Commission of Correctional Health Care (for jail) and standards of health care dictated by state or federal court decisions regarding the quality of health care for persons incarcerated in public correctional facilities.

2.6 <u>Discrimination</u>. CMS is fully committed to the challenge and opportunity to be an equal opportunity employer. CMS will make all decisions to recruit, select, train, transfer, promote and release employees without regard to age, race, sex, religion, national origin, Vietnam-era veteran or disabled veteran status. We will also ensure that equal employment opportunity is provided for qualified individuals with a disability. In addition, we will ensure that our human resources policies and practices, such as wages, benefits, lay-offs, social and training programs will be administered without regard to age, race, sex, sexual orientation, religion, national origin, disability, Vietnam-era veteran or disabled veteran status.

2.7 <u>Existing County Personnel</u>. CMS acknowledges that the SHERIFF has employed certain nursing personnel who are under the Hillsborough County Civil Service system and Florida Retirement Program, which nursing personnel are more specifically described in Attachment A to this Agreement, and which personnel CMS agrees will continue providing health care nursing services under the direction of the CMS program administrator.

CMS agrees to abide by all rights, privileges and benefits appertaining to civil service employees as they are or may hereinafter be established by law, ordinance, or rules and regulations of the Civil Service Board or Civil Service system in Hillsborough County.

The SHERIFF shall be entitled to a credit for the costs, salaries, benefits actually paid to or on account of the SHERIFF's Nurse, including, but not limited to, FICA, worker's compensation premiums or assessments, health and life insurance, professional liability insurance, and retirement (as shown in the example provided in Attachment B). In addition to those benefits enumerated herein, such benefits also include, but are not limited to, base pay, overtime, shift differential pay, vacation, holiday or sick pay, merit increases and travel or per diem costs, paid by the SHERIFF. Any such credits or payments shall not be subject to any assessment or fee for any purpose.

It is agreed between the parties that in the event of the termination, resignation or release of any nurse applicable to this section, such position vacated by any such nurse will be filled by a CMS employee and paid for by CMS, and the credit shall cease for that position.

## ARTICLE III: ACCREDITATION

3.1 <u>Accreditation</u>. CMS' services hereunder will be designed to meet the standards developed by the National Commission on Correctional Health Care for Jails (NCCHC), American Correction Association (ACA) and the Florida Model Jail Standards, and CMS will cooperate fully with the SHERIFF in any efforts to maintain formal accreditation for the Facility's health care program. Any deficiency in the performance of health care services under this agreement in the county correctional system resulting in notice from any regulatory or accrediting organization may constitute a material breach of this agreement and shall be rectified immediately. Failure to rectify any such deficiency within a thirty (30) day cure period may result in causing the SHERIFF, in his sole discretion, to terminate this agreement. In the event accreditation from the NCCHC is canceled for failure on the part of CMS to comply with standards, and such deficiency is not cured within a reasonable time, a performance penalty of $500,000 will be payable to the SHERIFF.

## ARTICLE IV: EDUCATION AND TRAINING

4.1 <u>Inmate and Staff Health Education</u>. CMS will conduct an ongoing health education program for Inmates and correctional officers at the Facility toward the objective of raising the level of Inmate health and health care. This health care education program will include, at the SHERIFF's request, programs in first aid, signs and symptoms of chemical dependency, and reactions to medical emergencies.

In addition, CMS will ensure that its medical, professional and para-professional staff receive all necessary and requisite statutorily mandated in-service annual or proficiency training, and other such professional or para-professional education and training programs needed to ensure current proficiency in the professional or para-professional's particular medical discipline or specialty. Twelve hours of SHERIFF's office civilian in- service must be documented annually.

## ARTICLE V: REPORTS AND RECORDS

5.1 <u>Medical Records</u>. CMS will cause to be maintained a medical record for each Inmate who has received health care services. This medical record will be maintained pursuant to applicable law and will be kept separate from the Inmate's confinement record. A complete copy of the applicable medical record will be available to accompany any Inmate who is transferred from the Facility to another location for off-site services. Medical records will be kept confidential, and CMS will follow the County's policy with regard to access by Inmates and Facilities staff to medical records, subject to applicable law regarding confidentiality of such records. No information contained in the medical records will be released by CMS except as provided by County's policy, by a court order, or otherwise in accordance with applicable law. Upon expiration or termination of this agreement, all such records shall thereupon become and remain property of the SHERIFF; provided, however, CMS shall have reasonable access to such records when necessary to enable it to properly prepare for litigation or anticipated litigation brought or threatened by third persons in connection with services rendered during the term

hereof.

5.2 <u>Microfilming of Records</u>. CMS will have the responsibility as set out in its response to the SHERIFF's request for proposal for microfilming Inmate medical records.

5.3 <u>Inmate Health Insurance</u>. CMS will seek and obtain from any Inmate information concerning any health insurance the Inmate might have that would cover services rendered by CMS hereunder, and the SHERIFF will cooperate fully with CMS in its efforts to secure this information. Any third party remuneration that is recovered or credited because of the efforts to collect payment by CMS from any third party source or entity, including without limitation, workers compensation insurance, commercial medial insurance, Medicare, Medicaid, federal, state or local health care benefits or programs, will be split, with seventy-five per cent (75%) to be credited to the SHERIFF and twenty-five per cent (25%) to CMS.

In keeping with both the spirit and letter of provisions of this section, CMS will ensure that it and anyone acting on its behalf or providing any medical services to any Inmate, will seek reimbursement for any such medical services in accordance with the provisions of FL 901.35 (except for FL 901.35 (2) (a), as it may be applicable to the Board of County Commissioners for Hillsborough County) and FL 951.032

5.4 <u>Inmate Information</u>. In order to assist CMS in providing the best possible health care services to Inmates, the SHERIFF will provide CMS with information pertaining to Inmates that CMS identifies as reasonable and necessary for CMS adequately to perform its obligations hereunder.

5.5 <u>Records Availability</u>. CMS acknowledges that it is familiar with the provisions of Florida's Public Records Law (Chapter 119, F.S.) And that all of its records, as they pertain to health care services for the SHERIFF, directly, or indirectly, are subject to the provisions of the Public Records Law of Florida unless specifically exempted under Chapter 119, Florida Statutes, or such other provisions of Florida law providing for the confidentiality of medical records. In the event that CMS should assert any proprietary or confidential status to any of its systems, methods, procedures, or written materials and other controls employed by CMS in the performance of its obligation pursuant to this Agreement, then CMS shall assert such claim on its own. In the event any legal action is brought by any person or entity against the SHERIFF for a writ of mandamus or similar cause of action in any court of competent jurisdiction for the release of any record or report maintained by CMS which CMS claims to have a proprietary interest or claims to be confidential in nature, then CMS will indemnify and hold harmless the SHERIFF from any and all judgments, costs, assessments or fees asserted against the SHERIFF by any court, including payment of reasonable attorney's fees incurred by the SHERIFF, as a result of CMS's claim of confidentiality or proprietary interest in any of its documents, records, reports or other instruments of communication.

5.6 <u>CMS Records Available to the SHERIFF with Limitations on Disclosure</u>. CMS will make available to the SHERIFF, at the SHERIFF's request, all records, documents and other papers relating to the direct delivery of health care services to Inmates hereunder; provided,

however, that the SHERIFF understands that the systems, methods, procedures, written materials and other controls employed by CMS in the performance of its obligations hereunder are proprietary in nature and will remain the property of CMS and may not, at any time, be used, distributed, copied or otherwise utilized by the SHERIFF, except in connection with the delivery of health care services hereunder, unless such disclosure is approved in advance in writing by CMS.

5.7 SHERIFF's Records Available to CMS with Limitations on Disclosure. During the term of this Agreement and for a reasonable time thereafter, the SHERIFF will provide CMS, at CMS' request, SHERIFF's records relating to the provision of health care services to Inmates as may be requested by CMS or as are pertinent to the investigation or defense of any claim related to CMS' conduct. The SHERIFF will make available to CMS such records as are maintained by the SHERIFF, hospitals, and other outside health care providers involved in the care or treatment of Inmates (to the extent the SHERIFF has any claim to those records) as CMS may reasonably request consistent with applicable law; provided, however, that any such information released by the SHERIFF to CMS that the SHERIFF considers confidential will be kept confidential by CMS and will not, except as may be required by law, be distributed to any third party without prior written approval by the SHERIFF.

5.8 Periodic Reports. CMS shall submit monthly and other periodic reports to the Commander of the Detention Department for the SHERIFF or the SHERIFF's Health Services Representative, concerning and reflecting on the overall operation of the health care services program in general or on the health status in particular of the Inmates committed to the custody of the SHERIFF. Such reports shall be submitted on a regular, periodic basis to be determined by mutual agreement of CMS and the SHERIFF. CMS will fully cooperate with the SHERIFF to respond to reporting requests from the appropriate authority or court for any reason whatsoever, or as may be required to support any provision or section of this agreement, without any additional charge, fee or assessment to the SHERIFF.

CMS will regularly confer with the SHERIFF's designated representative concerning existing health related procedures within the Facilities, and for the purpose of making changes, from time to time, of such procedures and other practices reasonably related thereto as CMS and the SHERIFF shall deem advisable.

## ARTICLE VI: SECURITY

6.1 General. CMS and the SHERIFF understand that adequate security services are necessary for the safety of the agents, employees and subcontractors of CMS, as well as for the security of Inmates and Facility staff. The SHERIFF will provide security services satisfactory to CMS and sufficient to enable CMS and its personnel safety to provide health care services called for hereunder. In the event that any recommendation by CMS for particular health services for any Inmate, or transfer or transfers to medical facility, should not be implemented and carried out for security reasons, CMS will be released from professional liability for any damages resulting from any such decision on the part of the SHERIFF not to respond or to institute a requested transfer of any Inmate. To the extent permissible by F.S. 768.28 and other

applicable provisions of Florida law, the SHERIFF agrees to indemnify CMS, its agents, employees, contractors and officers against any claims or losses arising out of Inmate disturbances or any other security failures and shall reimburse CMS for any and all costs incurred in connection with any such claims or losses.

6.2 <u>Transportation Off-Site</u>. The SHERIFF will provide security as necessary and appropriate in connection with the transportation of any Inmate between the Facility and any other location for off-site services as contemplated herein.

## ARTICLE VII: OFFICE SPACE AND EQUIPMENT

7.1 <u>Office Space and Support</u>. The SHERIFF agrees to provide CMS with office space, facilities, office furniture, utilities (including local telephone service), sufficient to enable CMS to perform its obligations hereunder. CMS will reimburse the SHERIFF for any long distance telephone charges that are made and billed to the SHERIFF from the phones that are assigned to CMS.

7.2 <u>Delivery of Possession</u>. The SHERIFF will deliver to CMS on the date of commencement of this Agreement possession and control of all office equipment and supplies then in place at the Facility's's health care facilities that are the SHERIFF's property.

7.3 <u>Supplies</u>. CMS warrants and represents that the quality and quantity of supplies on hand during this Agreement will be sufficient to enable CMS to perform its obligations hereunder.

7.4 <u>General Services</u>. The SHERIFF will provide for each Inmate confined to reside in a health care/clinical ward or infirmary setting, services no less that the full range of services and facilities provided by the SHERIFF for other Inmates at the Facility including, but not limited to, daily housekeeping services, dietary services, building maintenance services, personal hygiene supplies and services, and linen supplies.

7.5 <u>Medical Equipment Budget</u>. Based on input from the CMS medical administrator, the detention department will submit an annual budget for any capital equipment items necessary to provide services in the Facilities.

7.6 <u>Maintenance</u>. CMS will be responsible for the costs of all regular and routine maintenance of equipment not covered by warranty or pre-existing contract of the SHERIFF.

## ARTICLE VIII: TERM AND TERMINATION OF AGREEMENT

8.1 <u>Contract Term</u>. This Agreement will be effective as of 7:00 A.M. on October 1, 2000, for an initial term of two year(s). This Agreement shall be automatically renewed under like-terms for two additional, two-year terms unless either party delivers written notice of non-renewal to the other party at least 90 days prior to the expiration of the then-existing term, in which event this Agreement will terminate upon the expiration of the then-existing term.

8.2 <u>Termination</u>. This Agreement may be sooner terminated on the first to occur of the following:

  (a)   <u>Termination by Agreement</u>. In the event the SHERIFF and CMS mutually agree in writing this Agreement may be terminated on terms and date stipulated therein.

  (b)   <u>Termination for Default</u>. In the event either party shall give notice to the other that such other party has materially defaulted in the performance of any of its obligations hereunder and such default shall not have been cured within (30) thirty days following the giving of such notice in writing, the party giving notice shall have the right immediately to terminate this Agreement; provided, however, that the cure period shall be limited to (10) ten days if the default is failure by the SHERIFF to timely make any payments due CMS hereunder.

  (c)   <u>Termination by CMS for Special Situations</u>. CMS may terminate this Agreement immediately upon the occurrence of any of the following:

      (1)   Failure of the governing body of THE SHERIFF to authorize or appropriate funds sufficient for the SHERIFF to meet its obligations hereunder;

      (2)   Disavowal or repudiation of this contract by any authorized agent of the SHERIFF;

      (3)   Insolvency, bankruptcy, or receivership of the SHERIFF.

  (d)   <u>Termination without cause</u>. Either party may terminate this Agreement without cause, by giving 120 day written notice to the other party.

8.3 <u>Changes in the Law</u>. If any statute, rule or regulation is passed or any order issued or any statute or guideline adopted materially increasing the cost to CMS of providing health care services hereunder, CMS and the SHERIFF will agree on additional compensation to be paid by the SHERIFF to CMS as a result of such changes.

8.4 <u>Responsibility for Inmate Health Care</u>. Upon termination of this Agreement, total responsibility for providing health care services to all Inmates, including Inmates receiving health care services at facilities off site, will be transferred from CMS to the SHERIFF.

8.5 <u>Dispute resolution</u>. Any controversy or claim arising out of or relating to this Agreement or the alleged breach thereof that cannot be resolved short of litigation shall be resolved by a court of competent jurisdiction. Venue shall lie in Hillsborough County, Florida.

## ARTICLE IX: COMPENSATION

9.1 <u>Base Compensation</u>. The SHERIFF will pay CMS the Sum of $ <u>9,015,303.00</u> for the

first year of this Agreement for the daily average base inmate population of 3300 payable in twelve equal monthly installments of $ 751,275.25. CMS will bill the SHERIFF (15) fifteen days before the first day of the month for which services will be rendered, and the SHERIFF agrees to pay CMS on or before the fifteenth day of the month for which services will be rendered. In the event this Agreement should terminate, or be amended on a date other than the end of a calendar month, compensation to CMS will be pro rated accordingly for the shortened month.

For the second year of this agreement, the SHERIFF will pay CMS the sum of $ 9,504,500.00 for the daily average population of 3450 payable in monthly twelve installments of $ 792,041.66. CMS will bill the SHERIFF (15) fifteen days before the first day of the month for which services will be rendered, and the SHERIFF agrees to pay CMS on or before the first day of the month for which services will be rendered. In the event this Agreement should terminate, or be amended, on a date other than the end of a calendar month, compensation will be pro rated accordingly for the shortened month.

9.2 <u>Increases in Inmate Population</u>. A per diem rate of $ 1.46 will be applied to the monthly base compensation for each Inmate in excess of the daily base population (beyond a twenty-four hour period) of 3300 during the first year of the agreement.

During the second year of the agreement, a per diem rate of $ 1.46 will be applied to the monthly base compensation for each inmate in excess of the daily base population (beyond a twenty-four hour period) of 3450.

9.3 <u>Compensation for Renewal Terms</u>. Pricing will be adjusted for the renewal terms based on negotiations of the SHERIFF and representatives of his office and CMS.

9.4 <u>Staff Vacancies</u>. The SHERIFF will receive as an adjustment to the monthly invoice, a credit in the amount of twice the average hourly salary per position for each position that is unstaffed. This will be calculated by multiplying the average hourly wage by the number of vacant hours for each position other than the Administrator, administrative assistant, and pharmacy clerk. The staffing pattern is included for each of the four facilities in Attachment A.

9.5 <u>Penalties for Late History and Physicals</u>. The SHERIFF shall assess a fine of one thousand dollars a day for each fourteen (14) day History and Physical Assessment (H&P) that exceeds the required 14 days as stated in the FLORIDA MODEL JAIL STANDARDS.

## ARTICLE X: LIABILITY AND RISK MANAGEMENT

10.1 <u>Professional Liability Insurance</u>. At all times during the term of this Agreement, CMS will maintain professional liability insurance covering CMS, its employees, its officers, and agents with limits not less than $2 million per occurrence and $6 million in the aggregate annually. Physicians provided by CMS will be included in the above coverage or will carry their own insurance with limits of $1,000,000 per occurrence/ $3,000,000 annual aggregate.

10.2 <u>Comprehensive General Liability</u>. CMS will maintain over the term of this

Agreement, Comprehensive General Liability coverage of at least $300,000 bodily injury and property damage combined single limit.

10.3 <u>Comprehensive Auto Liability</u>. CMS will maintain over the term of this Agreement, a minimum coverage of $300,000 bodily injury and property damage combined single limit for autos owned by CMS.

10.4 <u>Worker's Compensation Insurance</u>. CMS will maintain over the term of this Agreement, Worker's compensation Insurance for all of its employee's connected with the work of this Agreement and in any case of sub-contracting, will ensure that the subcontractor has sufficient coverage as well. Such insurance will comply fully with the Florida Worker's Compensation Law. In case any hazardous work under this Agreement is not protected under this Worker's Compensation statue, CMS will provide and cause each sub-contractor to provide adequate insurance.

10.5 <u>Indemnity</u>.

    (a)    CMS agree to defend, indemnify and hold harmless the SHERIFF, its officers, agents, and employees, up to the limits of CMS' applicable liability insurance, from any claims based on CMS' performance of its obligations hereunder, provided the SHERIFF notifies CMS' Legal Department in writing within thirty (30) days after notice of a claim of the request for indemnification. Defense and indemnification will not apply where liability or alleged liability exists in whole or in part on the SHERIFF, his employees, agents, medical staff, facilities, premises or equipment. Indemnification and/or defense will not apply for expenses occurred or settlements offered or effected, prior to notice to CMS.

In no event, however, shall CMS' obligations in the preceding paragraph apply or extend to:

(i) any claim, liability, cost or expense arising or incurred at any time in connection with the treatment of any Inmate's injury if such injury occurred (1) during any period prior to the Inmate's incarceration, or (2) while the Inmate was away from the Facility for reasons other than health care prescribed by CMS employees or contractors; or

(ii) any claim, liability, or cost arising out of any SHERIFF's employee, officer, agent or subcontractor: (1) preventing any Inmate from receiving medical care ordered by CMS employees or contractors; (2) failure to exercise good judgement in promptly presenting any ill or injured Inmate for treatment by CMS employees or contractors.

    (b)    To the extent permitted by F.S. 768.28 and other provisions of Florida Law,

The SHERIFF agrees to indemnify, defend and hold harmless CMS, its officers, agents, employees and contractors from any and all claims, losses, damages, suits, liabilities, judgements, costs and expenses, whether for personal injury, property damage or other liability, arising out of or connected with the physical premises of the SHERIFF, or any of his employees, agents contractors or servants (i) performance or nonperformance of this agreement; (ii) preventing any Inmate from receiving medical care ordered or prescribed by CMS employees or contractors; (iii) failure to exercise good judgement in promptly presenting any ill or injured Inmate for treatment by CMS employees or contractors.

10.6 <u>Limitation of Liability</u>. The parties to this Agreement both acknowledge that CMS is providing the services contemplated hereunder as a corporation primarily acting as an instrumentality of the SHERIFF of Hillsborough County; consequently, any and all statutory, common law or legislative limitations on the liability of instrumentalities of the SHERIFF of Hillsborough County are applicable to CMS and its health care providers.

## ARTICLE XI: MISCELLANEOUS

11.1 <u>Independent Contractor Status</u>. The SHERIFF expressly acknowledges that CMS is an "independent contractor," and nothing in this Agreement is intended nor shall be construed to create an agency relationship, an employer/employee relationship, a joint venture relationship, or any other relationship allowing the SHERIFF to exercise control or direction over the manner or method by which CMS or its subcontractors perform hereunder.

11.2 <u>Assignment</u>. CMS shall not assign this Agreement to any other corporation without the express written consent of the SHERIFF. SHERIFF and CMS each binds itself, its successors, assigns and legal representatives to the other party hereto and to the successors, assigns, and legal representatives of such other party in respect to all covenants, agreements and obligations contained herein.

11.3 <u>Notice</u>. All notices or other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally in hand or mailed certified mail, return receipt requested, postage paid on the date posted, and addressed to the appropriate party at the following address or such other address as may be given in writing to the parties:

    (a)    Sheriff Cal Henderson:

        Sheriff of Hillsborough County
        2008 East 8th Avenue
        Tampa, FL 33605

With copies to:

        Col. David Parrish
        Dept. Commander, Detention
        1201 North Orient Road
        Tampa, FL 33619

(b)    CMS:

        Correctional Medical Services, Inc.
        12647 Olive Blvd.
        St. Louis, MO 63141

        Attention:
        Michael G. Pfeiffer, Executive Vice President

With a copy to:

        Correctional Medical Services, Inc.
        12647 Olive Blvd.
        St. Louis, MO 63141

        Attention:
        Todd Aschbacher, Assistant General Counsel

11.4 <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed according to, the laws of the State of Florida.

11.5 <u>Entire Agreement</u>. This Agreement, including Inmate Health Care RFP No. 09-00 and the CMS proposal, which by this reference are incorporated herein, constitutes the entire agreement of the parties and is intended as a complete and exclusive statement of the promises, representations, negotiations, discussions and agreements that have been made in connection with the subject matter hereof. To the extent there are conflicts between the terms of this Agreement and the terms of the Proposal, the terms in this Agreement shall take precedence. No modification or amendment to this Agreement shall be binding upon the parties unless the same is in writing and signed by the respective parties hereto.

11.6 <u>Waiver of Breach</u>. The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of

the same or other provision hereof.

11.7 <u>Force Majeure</u>.  CMS shall not be deemed in violation of this Agreement if it is prevented from performing any of its obligations hereunder for any reason beyond its control, including, without limitation, strikes, labor disputes, Inmate disturbances, lack of SHERIFF's financial or physical resources, failure of SHERIFF to provide proper security services, acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, flood failure of transportation, or any similar cause beyond the reasonable control of either party.

11.8 <u>Severability</u>.  In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement which shall remain in full force and effect and enforceable in accordance with its terms.

11.9 <u>Default</u>.  Unless CMS' performance is specifically exempted by this Agreement. SHERIFF shall be entitled to a credit for any costs the SHERIFF incurs for any medical services required to be performed by CMS when and to the extent that CMS shall fail to perform, as required under this Agreement, after written notice has been given to CMS of failure to perform and a thirty (30) day cure period has passed, when ordered by the Department of Corrections of the State of Florida, when ordered by any court of competent jurisdiction, or when otherwise required by law.

11.10 <u>Funding Sources</u>.  Both parties acknowledge that performance of this Agreement and payment for medical services to CM S pursuant to this Agreement is predicated on the continued annual appropriations by the Board of County Commissioners of Hillsborough County to the SHERIFF of Hillsborough County with specific funds allocated to meet the medical needs of the Inmates in the county correctional system, and the SHERIFF's ability to perform under this Agreement.

11.11 <u>Permits and Licenses</u>.  CMS acknowledges that it will maintain all relevant permits and licenses required to perform the services required by this Agreement and outlined in their responses to the proposal.  This will include but not be limited to licenses and permits for radiology and pharmacy.

11.12 <u>Performance Bond</u>.  CMS will deliver to the SHERIFF prior to the initiation of this contract, a Performance Bond of $1,000,000 on behalf of the SHERIFF.  This shall be made with a company licensed to transact surety business in Florida.  In addition, a bond for payment in case of CMS' inability to meet the payments necessary to perform this Agreement will be provided in the amount of $1,000,000, also made payable to the SHERIFF and also written by a surety company licensed to do business in the state of Florida.  In the event that CMS files for bankruptcy or reorganization under the bankruptcy laws of the United States, such filing is prima facie evidence and the performance and payment bonds will be waived in favor of the SHERIFF.

11.13 <u>Authority</u>.  Each Party hereto expressly represents and warrants that the person executing this Agreement on its behalf has full power and authority to do so; and this Agreement is the legal, valid and binding Agreement of each party.

**IN WITNESS WHEREOF,** the parties have set their hands and seals hereto as of the day and year first above written.

SHERIFF of HILLSBOROUGH COUNTY

Attest: _____

By: _____

Cal Henderson
Date: _10/11/00_____

Attest: _____

CORRECTIONAL MEDICAL SERVICES

By: _____

Michael G. Pfeiffer, Executive Vice President
Date: _10/18/00_____

| SO STAFF | APPROVED | DATE |
|----------|----------|------|
| ST/DIV | | |
| EPARTMENT | | 10-R-0 |
| CAL | | 10/16/0 |
| EGAL | | 10-6-00 |

Staffing Requirements effective 10/1/00.

### ORJ

| | |
|---|---|
| Administrator | 1.00 |
| ARNP (Combined) | 5.50 |
| Med. Techs. | |
| - ORJ | 1.00 |
| -Falkenburg | 2.00 |
| Charge RN | |
| -ORJ | 1.40 |
| -Falkenburg | 1.40 |
| Clerk | |
| -ORJ | 2.00 |
| Dental Assistant | |
| -ORJ | 1.00 |
| -Falkenburg | 1.00 |
| Dentist | |
| -ORJ | 1.00 |
| -Falkenburg | 1.00 |
| DON | |
| -ORJ | 1.00 |
| -Falkenburg | 1.00 |
| Medical Director | |
| -ORJ | 1.00 |
| Pharmacy Assistant | |
| -ORJ | 0.00 |
| -Falkenburg | 0.00 |
| Supply Clerk | |
| -ORJ | 1.00 |
| -Falkenburg | 1.00 |
| Psychiatrist | |
| -ORJ | 1.00 |
| -Falkenburg | 0.75 |
| X-ray Tech | |
| -ORJ | 1.00 |
| -Falkenburg | 0.25 |
| Infection Control RN | 1.00 |
| Infection Control Aide | 1.00 |
| Secretary | |
| -ORJ | 0.00 |
| -Falkenburg | 0.00 |
| Administrative Assistant | |
| -ORJ | 1.00 |
| -Falkenburg | 1.00 |

Psych. RN
-ORJ                               **1.50**
Falkenburg                         1.50
Staff Physician
-ORJ                               **1.00**
Falkenburg                         **1.00**
Morgan St.
Med. Rec. Sup.                     1.00
MRC
-ORJ                               **10.80**
-Falkenburg                        5.20
-Morgan St.                        1.00
RN Supervisor
-ORJ                               **2.80**
-Morgan St.                        **1.40**
RN
-ORJ                               **11.00**
-Morgan St.                        **3.20**
-Falkenburg                        4.80
LPN
-ORJ                               **30.80**
-Falkenburg                        **15.40**
-Morgan St.                        4.20
HIV LPN
RN Educator                        **1.00**
County Nurse                       1.00

                    **Total**      **128.9**

file:cmsbilling
sheet:cambridge

## C M S - MONTHLY INVOICE ADJUSTMENTS

### ROSA CAMBRIDGE - ACTUAL PAYROLL ADJUSTMENTS

#### MONTH OF AUGUST 2000

| NAME | DATE | RATE | REG HOURS | OVT HRS | HOLIDAY SICK VACATION | ST OT | COMP LEAVE | REG WAGES | OVT WAGES | DEF COMP | CAP. WAGES | TOTAL WAGES | FICA | MEDICARE | RET | HEALTH | LIFE | LTDQ | WC | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ROSA CAMBRIDGE | 08/05/00 | 23.75 | 80.00 | 1.63 | 0.00 | 0.00 | 0.00 | 1,900.00 | 58.07 | 28.50 | 0.00 | 1,986.57 | 123.17 | 28.81 | 190.74 | 0.00 | 0.00 | 3.18 | 5.58 | 2,346.04 |
| ROSA CAMBRIDGE | 08/20/00 | 23.75 | 40.00 | 0.00 | 32.00 | 0.00 | 0.00 | 1,900.00 | 0.00 | 28.50 | 60.00 | 1,988.50 | 115.35 | 26.98 | 192.85 | 400.00 | 3.60 | 3.09 | 5.47 | 2,735.83 |
| ROSA CAMBRIDGE | | 23.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL | | | 128.00 | 1.63 | 32.00 | 0.00 | 0.00 | 3,800.00 | 58.07 | 57.00 | 60.00 | 3,975.07 | 238.52 | 55.78 | 391.59 | 400.00 | 3.60 | 6.26 | 11.05 | 5,081.87 |

ATTACHMENT "B"

page 1
of 1